USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/14/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LAZER WAGSCHAL,

                      Plaintiff,

v.

PRINCIPAL LIFE INSURANCE
COMPANY,

                      Defendant.

No. 16-CV-1029 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Before this Court are Plaintiff Lazer Wagschal ("Mr. Wagschal") and Defendant Principal Life Insurance Company's ("Principal Life") cross-motions for summary judgment in this action brought pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001 et seq. ("ERISA"). For the reasons that follow, Principal Life's motion is granted and Mr. Wagschal's motion is denied.

## BACKGROUND[1]

### I. Initial Disability Review, Denial, and Reconsideration

In March 2000, Mr. Wagschal began working as a sales agent for Gateway Energy Services Corporation ("Gateway"), which was acquired by Direct Energy LP, Inc. ("Direct Energy") in about 2011. Principal Life provided group long-term disability insurance for Direct Energy employees. In January 2012, Mr. Wagschal, then age 59, left his employment with Gateway,

---

[1] The Court draws the relevant background facts from the parties' Rule 56.1 materials and the Administrative Record. *See* Dkts. 59, 62, 64–67, 70, 72.

1

complaining of back pain, heel pain, ankle instability, shoulder pain, allergies, and asthma, and sought long-term disability benefits from Principal Life. Principal Life's policy for Direct Energy employees—("the Group Policy")—defines "disabled" as follows for the initial 24-month period:

> The Member cannot perform the majority of the Substantial and Material Duties of his or her Own Occupation.

Administrative Record ("AR") at 5306.

After that 24-month period, the definition of disabled changes in relevant part to the following:

> The Member cannot perform the majority of the Substantial and Material Duties of any occupation for which he or she is or may reasonably become qualified based on education, training, or experience.

*Id.*

"Substantial and Material Duties" are defined in the Group Policy as:

> The essential tasks generally required by employers from those engaged in a particular occupation that cannot be modified or omitted.

*Id.* at 5315.

The Group Policy also provides that Principal Life:

> has discretion to construe or interpret the provisions of the Group Policy, to determine eligibility for benefits, and to determine the type and extent of benefits, if any, to be provided. The decisions of [Principal Life] in such matters shall be controlling, binding, and final as between [Principal Life] and persons covered by this Group Policy, subject to [claims procedures contained elsewhere in the Group Policy].

*Id.* at 5319.

In March 2012, Principal Life received and evaluated Mr. Wagschal's claimant statement, a statement from his employer, as well as the statements from several attending physicians. One

2

was from Dr. Steven Fessel, a podiatrist who had examined and diagnosed Mr. Wagschal's ankle instability and heel pain, which limited Mr. Wagschal's ability to walk. Another was from Dr. Frank Moore, a neurosurgeon who noted that Mr. Wagschal had a disc herniation, which caused pain and generally prevented him from bending and lifting, as well as sitting or standing for long periods. Allergist Dr. Eric Applebaum also noted diagnoses of allergic asthma, rhinitis, chronic sinusitis, and food allergies. On January 16, 2012, Mr. Wagschal had undergone spinal surgery. When Principal Life followed up with Dr. Moore in April 2012 about that surgery, he told the company that the surgery usually caused restrictions for sedentary jobs for 3–6 months afterwards.

In April and May 2012, Principal Life continued to follow up with Mr. Wagschal's doctors and requested additional medical records. On April 18, 2012, Dr. Fessel informed Principal Life that Mr. Wagschal could not yet return to work, noting his patient's chronic ankle instability, pain and swelling, and an inability to walk for any length of time. Later that month, Dr. Moore indicated that Mr. Wagschal had gained back some strength and range of motion and was suffering less pain and estimated a return-to-work date of August 1, 2012. Principal Life also reviewed Mr. Wagschal's physical therapy records, descriptions of his job, and conducted a phone interview with him. The company also referred Mr. Wagschal's file to Dr. Anthony Sciorrotta for an internal medicine consultant review, which resulted in Dr. Sciorrotta's diagnosis of Mr. Wagschal as suffering from degenerative cervical spine disease and his recommendation for further review by an orthopedist. Mr. Wagschal also provided Principal Life with Dr. Jonathan Aviv's diagnosis of the paralysis of his left vocal cord, and Dr. Brad Parsons' diagnosis of shoulder impingement.

On June 22, 2012, Principal Life requested an occupational analysis of Mr. Wagschal's former job, which a consultant then found to be a light strength occupation. While these

evaluations were underway, Mr. Wagschal, as he had since January 2012, continued to receive short-term disability benefits. Additionally, Mr. Wagschal had applied for disability benefits through the Social Security Administration, which were granted in July 2012 when the agency found him totally disabled.[2] Until August 2012, Mr. Wagschal also received unemployment insurance benefits.

On July 16, 2012, Principal Life set up an independent medical examination, which Dr. Jeffrey S. Liva conducted on August 13, 2012. In his August 24, 2012 report, Dr. Liva wrote, among other findings, that Mr. Wagschal could "sit continuously two-thirds of the time," "stand occasionally . . . walk occasionally . . . bend . . . twist . . . stoop and knee . . . [and] crouch and crawl up to one-third of the time." AR at 4794. Dr. Liva also found that Mr. Wagschal could "climb and balance never," and had restrictions on what he could lift, carry, and grasp. *Id.* Dr. Liva wrote that he had not observed Mr. Wagschal suffering from neurological deficits, muscle atrophy or weakness, or limits to his fine motor activities. Dr. Liva further wrote that the severity of Mr. Wagschal's condition was difficult to tell because he had not yet achieved maximum medical improvement—"the date after which further recovery and restoration of function can no longer be anticipated based upon a reasonable degree of medical probability." *Id.*

On September 27, 2012, Principal Life denied Mr. Wagschal's long-term disability claim, finding that he did not meet the Group Policy's definition of disability governing the initial 24-month period. Mr. Wagschal, through an attorney, submitted a request for reconsideration six

---

[2] "[P]lan administrators are not considered 'arbitrary and capricious' for failing to reach the same disability determination as the [Social Security Administration], nor are they required to do so by ERISA." *Alto v. Hartford Life Ins. Co.*, No. 09-CV-7763, 2011 WL 1330863, at 5 n.1 (S.D.N.Y. Mar. 31, 2011) (citing *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 91–92 (2d Cir. 2009)).

months later. Principal Life then requested additional medical records and referred the claim for review by Dr. David Marder, who is dual-certified in internal and occupational medicine. On May 1, 2013, Dr. Marder reported, among other findings, that Mr. Wagschal could walk and stand for brief periods only, had limits on what he could reach or lift, and should have stretching breaks from sitting of at least five minutes per hour. Dr. Marder also found that there were "no objective findings noted in the medical records provided that would restrict him from sitting or driving." *Id.* at 4294. He concluded that Mr. Wagschal could work full time with the restrictions he had listed. After reviewing additional medical records from Dr. Bernard Schayes, Dr. Marder wrote that the records did not change the conclusion of his earlier report.

On May 28, 2013, Principal Life overturned its earlier denial and approved Mr. Wagschal's claim for long-term disability benefits. Principal Life found that, given the restrictions listed by Dr. Marder, Mr. Wagschal could work only in a sedentary capacity, not in his light duty occupation.

## II. "Any Occupation" Denial and Appeals

Principal Life continued to review Mr. Wagschal's claim, in part because the applicable definition of "disability" was set to change on May 14, 2014. As noted, while previously Mr. Wagschal must only have been unable to perform the essential tasks of his own occupation, after May 14, 2014, he would have to demonstrate that he was unable to perform those tasks for "any occupation for which he [] is or may reasonably become qualified based on education, training, or experience." AR at 5306.

Among other inquiries and actions, on July 22, 2013, Principal Life referred Mr. Wagschal's file for review to otolaryngologist Dr. Angelo Consiglio. Dr. Consiglio noted that Mr.

5

Wagschal had begun speech therapy, but recommended total voice rest, which he explained meant "speaking only as necessary to communicate needs, but no additional speaking and no speaking for extensive periods of time." *Id.* at 3427. Principal Life also ordered surveillance of Mr. Wagschal from March 20 through March 22, 2014. Video footage from the surveillance showed Mr. Wagschal driving to a synagogue, talking on a cell phone, and conversing with another man for under 20 minutes.[3] On May 27, 2014, Principal Life asked Dr. Aviv—who had previously diagnosed Mr. Wagschal with paralysis of the left vocal cord—whether his patient "would be able to engage in employment activity in which he did not need to constantly speak?" *Id.* at 2848. Dr. Aviv circled the "Yes" response, though he added that he was recommending "complete voice rest." *Id.* He concluded that Mr. Wagschal "should be able to engage in activity when he does not use his voice at this time." *Id.* Psychiatrist Dr. Dale Panzer also concluded that although Mr. Wagschal had reported decreased concentration and certain somatic symptoms, he had not found objective evidence that Mr. Wagschal was suffering any functional impairment due to a psychiatric or psychological condition.

After reviewing these records and others, Principal Life terminated Mr. Wagschal's long-term disability benefits on May 29, 2014, effective May 14, 2014. He appealed the termination of his benefits on November 24, 2014. Mr. Wagschal provided Principal Life with a letter from the soprano Sharla Nafziger. Ms. Nafziger wrote that Mr. Wagschal had been seeing her for vocal therapy for roughly the past year, that he had been able to "make some progress in terms of vocal health," but that he still experienced fatigue when speaking. *Id.* at 2665. She concluded that there

---

[3] Principal Life's surveillance videos have no sound.

was "a long way to go" before more fulsome healing occurred, and that in the meantime Mr. Wagschal "should avoid long conversations on the phone as much as possible, especially for business purposes, as these calls are very stressful and cause tremendous vocal fatigue." *Id.* at 2666. Mr. Wagschal also provided Principal Life with records from his visit with Dr. Judith Khan, who noted that "after 15–20 minutes [Mr. Wagschal's] voice becomes hoarse, and it is much harder for him to talk" and that Mr. Wagschal "cannot talk for more than 20 min due to his vocal cord paralysis." *Id.* at 2652.

On January 29, 2015, after several re-schedulings, Dr. Nathan Zemel conducted an independent medical examination of Mr. Wagschal. Among other findings, Dr. Zemel reported that Mr. Wagschal was able to sit for 15–20 minutes before changing positions and had credible complaints of voice fatigue, including an inability "to talk at length and at an audible level at times." *Id.* at 1751. He found that Mr. Wagschal suffered from, among other ailments, right carpal tunnel syndrome, but indicated that Mr. Wagschal could use the power grasp of his right arm occasionally, the simple grasp frequently, and fine manipulation occasionally. He also noted that Mr. Wagschal could use the power and simple grasps and fine manipulation of his left arm frequently. In his initial report, Dr. Zemel wrote that "because of functional and pain considerations [Mr. Wagschal] would be limited from performing full-time sedentary occupation, since 05/14/14." *Id.* at 1469. In his revised report, however, Dr. Zemel amended that statement to reflect that Mr. Wagschal "would be limited *to* performing full-time sedentary occupation, since 05/14/14." *Id.* at 1483 (emphasis added). Dr. Zemel also checked the "Sedentary Work" box on a form titled "Patient's Restrictions and Capabilities" when asked what kind of work "your patient is capable of performing in an eight (8) hour day." *Id.* at 1474. On February 24, 2015, Principal

7

Life upheld its termination of Mr. Wagschal's long-term disability benefits, again finding that he did not meet the "any occupation" definition of disability under the Group Policy.

Mr. Wagschal appealed again on March 24, 2015. As part of that review, Principal Life obtained specialists' opinions on Mr. Wagschal from three doctors in the fields of orthopedics, neurology, and otolaryngology. Orthopedic surgeon Dr. David Getz reported that Mr. Wagschal could sit for up to one hour at a time, "for 6 hours total in an 8 hour day with the ability to change position as needed for comfort." *Id.* at 620. He noted that, according to the medical records he had reviewed, another doctor had found Mr. Wagschal to be suffering from "mild bilateral carpal tunnel syndrome, which was symptomatic of the right hand." *Id.* at 617. Dr. Getz found Mr. Wagschal to be suffering from right carpal tunnel syndrome. Ultimately he concluded that, based on his medical experience and his review of the provided medical records, there was "no medical evidence that would lead [him] to believe that the claimant would not be capable of fulltime sedentary work activities presently from an orthopedic standpoint" and that there was "no indication that [Mr. Wagschal's] symptoms are completely disabling." *Id.* at 620. He added that still images of the March video surveillance of Mr. Wagschal "suggest a higher than claimed level of activity." *Id.*

Neurologist Dr. David Hoenig came to the same conclusion that Mr. Wagschal was able to perform full-time sedentary work, though "from a neurological perspective only." *Id.* at 607. He also reported that because of vocal cord paralysis, Mr. Wagschal could occasionally talk for up to 5 minutes at a time, for a total of up to one hour a day. Lastly, otolaryngologist Dr. Alan F. Lipkin, when asked about Mr. Wagschal's ability to perform full time sedentary work activities, noted that while there was "no otolaryngology contraindication to a specific activity level," Mr. Wagschal

8

was restricted to "essential speech only," had "very limited voice use," and "is not able to consistently use voice for his occupation." *Id.* at 597.

On May 4, 2015, Principal Life ordered additional video surveillance of Mr. Wagschal, which was conducted from May 21 through May 23, 2015 and showed him driving to a synagogue, carrying small items, and briefly conversing with others. On May 5, 2015, Principal Life ordered an employment assessment and labor market search to ascertain possible employment alternatives for Mr. Wagschal. Principal Life's consultant produced a report ("Report #1") that found several categories of potential jobs generally suited for Mr. Wagschal, but each also required frequent to constant vocal use. Report #1, however, did not contain the full labor market survey that Principal Life had requested.

On June 19, 2015, Principal Life ordered another labor market survey and employer canvass for the 60 miles surrounding Mr. Wagschal's hometown of Monsey, New York in Rockland County, within the general confines of the job categories returned from the first employment report. That employment report ("Report #2") found one opening for a full time customer interaction job that could "be performed with no speaking throughout the workday." *Id.* at 417. Report #2 noted that the company with the opening already had "one employee assigned strictly to email and chatroom functions because of a physical restriction related to speaking." *Id.* Report #2 also identified a second employer that might consider hiring a customer service employee "to work exclusively with email and live chat." *Id.* The first job listing listed "college (bachelor's degree)" as a qualification; the second stated that the employer "prefers applicants with a college degree." *Id.* at 417–18. Mr. Wagschal does not have a college degree and attended a religious Yeshiva school, which he contends did not provide him with a high school degree, GED,

9

or any other equivalent. Mr. Wagschal nevertheless worked in sales for Gateway for 12 years, in a job which also listed a preference for a bachelor's degree in sales and marketing, as well as familiarity with computer use.

On July 10, 2015, Principal Life upheld its termination of Mr. Wagschal's benefits, citing both medical and occupational records. On January 13, 2016, Mr. Wagschal brought suit in New York state court seeking long-term disability benefits dating from May 14, 2014. On February 10, 2016, Principal Life removed the case to federal court. After limited discovery outside the administrative record, both parties moved for summary judgment. Dkts. 56, 60.

## LEGAL STANDARD

### I. Summary Judgment

"Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Metro. Life Ins. Co. v. Bigelow*, 283 F.3d 436, 440 (2d Cir. 2002) (citing Fed. R. Civ. P. 56). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002). "Where, as here, there are cross-motions for summary judgment, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010) (internal quotation omitted). "[T]he existence of disputed facts that are immaterial to the issues at hand is no impediment to summary judgment." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990).

## II. ERISA

ERISA actions are evaluated either under a *de novo* or more deferential arbitrary and capricious standard. The *de novo* standard applies unless the relevant benefit plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When there is such discretionary authority present, courts "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (citation omitted).[4] Such a conclusion is arbitrary and capricious when it was made "without reason, unsupported by substantial evidence or erroneous as a matter of law." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008) (citation omitted). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached . . . [and] requires more than a scintilla but less than a preponderance." *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d Cir. 2003) (internal quotation omitted). "Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control." *McCauley*, 551 F.3d at 132 (citation omitted). A court may not "substitute [its] own judgment . . . as if [it was] considering the issue of eligibility anew." *Hobson*, 574 F.3d at 83–84.

The parties do not dispute that the arbitrary and capricious standard applies—indeed, Article 9 of the Group Policy plainly gives Principal Life the requisite discretionary authority. *See*

---

[4] "The term 'arbitrary and capricious' is used interchangeably with the phrase 'abuse of discretion,' and either describes the deferential standard applied when an ERISA plan reserves discretion for the administrator." *Mack v. Verizon Commc'ns Inc.*, No. 16-CV-7138 (GHW), 2017 WL 6375786, at *5 (S.D.N.Y. Dec. 12, 2017) (citation omitted).

11

AR at 5319 (stating that Principle Life "has discretion to construe or interpret" the Group Policy's provisions, and that its interpretations "shall be controlling, binding, and final"); *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999). Mr. Wagschal points out that where, as here, the plan administrator both evaluates and pays claims, there is a structural conflict of interest that courts must take into account. *See McCauley*, 551 F.3d at 132–33 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112–18 (2008)). The existence of that conflict, however, "does not make *de novo* review appropriate," even if a plaintiff "shows that the conflict of interest affected the choice of reasonable interpretation." *Id.* at 133. Rather, the Court will review Principal Life's denial of benefits under the arbitrary and capricious standard of review, bearing in mind the structural conflict.

## DISCUSSION

### I. Full-Time Sedentary Work

Mr. Wagschal first argues that he cannot work full time, even in a sedentary occupation. Principal Life's conclusion to the contrary, however, was not arbitrary or capricious. The parties are largely in agreement as to Mr. Wagschal's medical conditions and that Mr. Wagschal has objectively established them. But as Principal Life rightly points out, the conditions themselves are not what would entitle Mr. Wagschal to long-term disability benefits. Rather, by the terms of the Group Policy, Mr. Wagschal must demonstrate that—because of his medical conditions—he is unable to perform the essential tasks of "any occupation for which he [] is or may reasonably become qualified based on education, training, or experience." AR at 5306. That standard is a demanding one. And in the context of this lawsuit, Mr. Wagschal's burden is doubly difficult,

because he must, as noted, demonstrate that Principal Life's finding that he was not so disabled was unsupported by substantial evidence or was without reason.

The medical records described above provide ample justification for Principle Life's finding that Mr. Wagschal could perform full-time sedentary work. Doctor after doctor, in different areas of expertise, found Mr. Wagschal capable of such work. Mr. Wagschal's arguments to the contrary are largely conclusory. He notes that many doctors concluded that he was suffering from serious ailments and found him limited in terms of his ability to move and speak. But those same doctors also found Mr. Wagschal capable of working in a full-time sedentary job. This Court has no reason to accept their medical diagnoses but reject their medical conclusions about his ability to work.

At first glance, Mr. Wagschal's strongest piece of evidence against Principal Life's decision appears to be the portion of Dr. Zemel's January 29, 2015 report in which the doctor noted that Mr. Wagschal would be "limited from" full-time sedentary work. *Id.* at 1469. As noted, however, in his February 20, 2015 revised report, Dr. Zemel changed that conclusion to "limited to" full-time sedentary work, *id.* at 1723, strongly suggesting that the initial use of the word "from" was in error. That revision also aligned with Dr. Zemel's explicit recommendation on the "Patient's Restrictions and Capabilities" form that Mr. Wagschal *was* capable of performing sedentary work in an eight-hour workday. *Id.* at 1474. Principal Life thus had good reason to rely on the revised report that was consistent with the doctor's other notations rather than on the report's first iteration. In short, Principal Life has established that there is no genuine dispute as to whether its decision that Mr. Wagschal was capable of full-time sedentary work was based on substantial evidence.

## II. "Any Occupation" Disability

Mr. Wagschal next argues that Principal Life did not find any occupations for which he is or may reasonably become qualified. Here too Principal Life's contrary conclusion was not arbitrary and capricious. The heart of this dispute boils down to the two employment assessment reports that Principal Life ordered—Reports #1 and #2. As described above, given the restrictions on the use of Mr. Wagschal's voice, Report #1 was "unable to identify suitable occupational alternatives." AR at 535. But that report analyzed only general job categories and did not contain the full labor market survey that Principal Life had requested. Principal Life then ordered Report #2, which did list specific jobs, as well as their demands and qualifications. Report #2 identified, in the category of "Online Sales/Chat Sales (Order Clerk)," two employers who either had or hoped to have full-time sedentary jobs that fit within Mr. Wagschal's physical and occupational restrictions. In either position, Mr. Wagschal would not be required to use his voice regularly, if at all.

Mr. Wagschal responds with a number of complaints about the specific jobs listed in Report #2—for example, that some of them require long commutes or pay less than $30,000 a year. But Principal Life interprets its policy to mean that it only had to identify a suitable occupation in the national economy for Mr. Wagschal—not find him a specific job. Other courts have found this interpretation of near-identical definitions of "disability" to be reasonable, *see, e.g., Das v. Unum Life Ins. Co. of Am.*, No. 04-0971, 2005 WL 742444, at *11 (E.D. Pa. Mar. 31, 2005); *Chauvin v. Unum Life Ins. Co. of Am.*, No. 01-0157, 2002 WL 461523, at *5 (E.D. La. Mar. 22, 2002), and in light of the similarly broad language used in the Group Policy, this Court agrees that Principal Life's interpretation is reasonable. Thus, whether or not the specific job listings meet all of Mr.

14

Wagschal's salary and commute preferences, their existence fulfills Principal Life's burden to show that Mr. Wagschal is able to perform the essential tasks of an occupation for which he is or may reasonably become qualified.

Mr. Wagschal also objects that the jobs listed require typing, which he claims he cannot do because of his carpal tunnel syndrome. But the medical records establish that two of the doctors aware of Mr. Wagschal's carpal tunnel—Dr. Zemel and Dr. Getz—nonetheless concluded that he was fit to work in a full-time sedentary job. Mr. Wagschal's medical records also note that another doctor had found the syndrome to be "mild." AR at 605, 617. The findings of Dr. Liva and Dr. Zemel, moreover, record at most moderate restrictions to Mr. Wagschal's fine motor abilities. In light of those records, Principal Life's determination that Mr. Wagschal could work in an occupation that requires typing was not arbitrary and capricious.

Mr. Wagschal next contends that he cannot perform either of the jobs that would not require speech because they list a college degree as either a qualification or a preference. Even assuming that all such jobs in the national economy would similarly prefer a college degree, before he left Gateway, Mr. Wagschal worked in a sales job which also had a formal preference for a bachelor's degree. Mr. Wagschal was able to do that job for 12 years—interacting with customers in person and through email—even though he lacked a formal high school degree. *See id.* at 5552–53. The type of customer interaction job described in Report #2 would therefore seem to be within Mr. Wagschal's reach based on his training and experience and Principal Life did not act arbitrarily and capriciously in so finding.

Lastly, no evidence suggests—for either the medical or occupational aspects of Principal Life's conclusions—that the company's structural conflict tainted its decision-making process.

Principal Life appears to have scrupulously evaluated Mr. Wagschal's claims, ordered comprehensive follow-up medical reviews, and demonstrated a willingness to reverse itself when it felt that the evidence no longer supported its conclusions. The company's requisition of Report #2 was justified by the inadequacy of Report #1, and resulted in a more informative employment assessment. In any event, the import of the medical and occupational evidence is clear: substantial evidence supported the conclusion that, under the relevant definition in the Group Policy, Mr. Wagschal was not disabled.

In sum, because there is no genuine dispute that Principal Life, based on substantial medical and occupational evidence and after multiple layers of review, reasonably concluded that Mr. Wagschal could work in a full-time sedentary job and that suitable occupations existed, the company acted within its proper discretionary authority in denying Mr. Wagschal long-term disability benefits.

## CONCLUSION

Although the Court is sympathetic to Mr. Wagschal's situation, the relevant case law governing policies such as the one at issue here set out a highly deferential standard, and the record establishes that Principal Life acted within the proper scope of its discretion. Accordingly, for the reasons stated above, Principal Life's motion for summary judgment must be granted, and Mr. Wagschal's denied.

The Clerk of the Court is respectfully requested to terminate docket entries 56 and 60 and close this case.

SO ORDERED.

Dated: September 14, 2018
New York, New York

_____
Ronnie Abrams
United States District Judge